***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission adopts the Opinion and Award of Deputy Commissioner Ledford with modifications.
 *********** *Page 2 
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. An employee/employer relationship existed between the Employee-Plaintiff Jamie Moore and the Employer-Defendant Sullbark Builders.
3. The Employer-Defendant had workers' compensation insurance coverage through the Carrier-Defendant, and such policy was in full force and effect on December 7, 2005.
4. The parties stipulated into evidence a pack of documents, including Industrial Commission forms, Plaintiff's medical records, Plaintiff's discovery responses, and photographs.
5. Subsequent to the hearing before the deputy commissioner, documents were accepted into evidence as part of the Deposition of Shayne Gad, Ph.D. including: (1) Curriculum Vitae of Shayne Cox Gad, Ph.D., D.A.B.T, A.T.S; (2) Toxicology Results; (3) medical records from Highlands-Cashiers Hospital; and (4) photocopies of three scientific articles on drug testing.
 *********** EVIDENTIARY RULINGS
At hearing before the deputy commissioner, Plaintiff objected to the admission of evidence related to the toxicology screening results from Mission Hospital, dated December 7, 2005. Deputy Commissioner Ledford allowed Defendants ten days, from the date of the hearing, to submit a Motion to admit the toxicology screening results. By Order filed April 10, 2007, *Page 3 
Deputy Commissioner Ledford allowed Defendants' Motion and allowed the toxicology screening results to be admitted as evidence.
The objections made in the depositions of Andrew Mason, Ph.D. and Shayne C. Gad, Ph.D., are ruled upon in accordance with the applicable law and the findings of fact and conclusions of law set forth in this Opinion.
 ***********
As set forth in the Pre-Trial Agreement and this Opinion and Award, the Commission addresses the following:
 ISSUES (a). Whether the Plaintiff was under the influence of a controlled substance at the time of the accident, which proximately caused his accident such that benefits should be denied pursuant to N.C. Gen. Stat. § 97-12?
 (b). If the Commission determines that the Plaintiff was not under the influence of a controlled substance which proximately caused his fall, then what benefits is he entitled to receive?
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was thirty years of age on the date of the hearing before the deputy commissioner, with a birth date of February 16, 1976. He completed the ninth grade. He had worked as a trim carpenter and in construction for five years prior to the work injury. He began working as a trim carpenter for the Employer-Defendant on October 10, 2005. *Page 4 
2. As a trim carpenter, Plaintiff performed duties including installing interior trim, putting up crown and window molding, installing interior doors, putting down hardwood floors, and preparing stair railings. In connection with those duties, Plaintiff transported materials in and out of job sites. Plaintiff would often have to travel up and down steps and negotiate curbs.
3. On December 7, 2005, Plaintiff got up before 6:00 a.m. and left for work around 6:20 a.m. He met his co-employee and supervisor for Defendant, Bob Wilhelm, for coffee at the Huddle House in Franklin, North Carolina at approximately 6:30 a.m. Plaintiff and Mr. Wilhelm then rode in Mr. Wilhelm's truck to the work site near Cashiers, North Carolina, a drive which takes 55 minutes or more.
4. On December 7, 2005, Plaintiff and Bob Wilhelm were working on the completion of a porch, finishing up some steps and a "punch list" at a house being built in Cashiers. Plaintiff and Bob Wilhelm worked all morning and then took a lunch break. The two men ate lunch by the fireside and were not apart for more than a few minutes at any time.
5. After lunch, around 1:00 p.m., Plaintiff and Mr. Wilhelm began working on building wooden steps outside from the deck to the driveway. At the edge of the driveway was a rock retaining wall. Along the top of the retaining wall was a rough wood-stacked fence approximately two feet tall, which apparently had been installed by the homeowner. This area is depicted in the photographs submitted as evidence. Mr. Wilhelm sat or kneeled down in the driveway next to the porch to measure and place the boards for the steps. Plaintiff cut the boards using tools on the porch.
6. As Plaintiff was carrying the second board on his shoulder, he stepped down from the porch onto the driveway, a drop of about a foot and a half. Plaintiff had to step around Bob Wilhelm. When Plaintiff stepped down from the porch, his foot landed on the small asphalt *Page 5 
bump in the driveway at the edge of the retaining wall. Plaintiff turned his ankle, lost his balance, and stumbled to the right toward the top of the retaining wall. As he fell sideways, Plaintiff reached out with his free hand to steady himself by grabbing the wood-stacked fence. However, this fence was not securely attached and gave way. Plaintiff tumbled over the edge of the retaining wall, falling about ten to twelve feet to the ground below the driveway and landing on his back.
7. Bob Wilhelm and Plaintiff had worked closely together all morning and were never apart for more than a few minutes prior to Plaintiff's fall. Plaintiff had worked with power tools, such as the saw, with no difficulty or signs of impairment. Mr. Wilhelm observed that Plaintiff did not smoke marijuana on the drive to work, nor did he see Plaintiff smoke marijuana in any fashion at the work site. Mr. Wilhelm did not smell marijuana on or about Plaintiff. Mr. Wilhelm was familiar with both the appearance and smell of marijuana and was likewise familiar with the typical signs of an individual impaired by marijuana use. Mr. Wilhelm observed that Plaintiff did not appear to be high or impaired in any way.
8. Lionel Parris, Defendant's Project Manager, arrived at the work site during their lunch break. He spoke with the Plaintiff briefly. He gave Bob Wilhelm a punch-list of tasks for them to work on that afternoon. Lionel Parris never saw the Plaintiff high or impaired at work. Mr. Parris testified that on the day of the injury, he did not observe any sign or have any reason to suspect that Plaintiff was high or impaired in any way.
9. After the fall, Bob Wilhelm came down and helped Plaintiff to his feet. Mr. Wilhelm then drove Plaintiff to the nearest hospital, Highlands-Cashiers Hospital. Along the way, Mr. Wilhelm called SullBark Builders on his cell phone and reported the work accident. *Page 6 
10. At the hospital, Plaintiff received emergency medical treatment. He was diagnosed with a fractured spine and sternum, and was given two doses of morphine for pain. The medical records of Highlands-Cashiers Hospital note no physical signs of Plaintiff being under the influence of a controlled substance. The records describe Plaintiff as awake and alert. Plaintiff was then transferred by EMS to Mission Hospitals in Asheville, North Carolina.
11. At Mission Hospitals, the Plaintiff was seen by Dr. Errington Thompson, who diagnosed him with a thoracic spine fracture, pulmonary contusion, and dehydration. Dr. Richard Lytle, a neurosurgeon, then saw Plaintiff in consultation and confirmed the diagnosis of a T8-9 fracture subluxation.
12. On December 12, 2005, Dr. Richard Lytle performed thoracic spine surgery on Plaintiff, including the following procedures: posterior T6 to T11 fusion with pedicle screw fixation from T6 to T11; posterolateral fusion T6 to T11; iliac crest bone graft; T8 and T9 laminectomies; and stealth neuronavigation. Plaintiff was discharged from Mission Hospitals on December 16, 2005.
13. Plaintiff had a urine toxicology screen a few hours after arriving at Mission Hospitals. The urine toxicology screen results indicated a positive result for cannabinoids and opiates. The results did not provide any numeric levels of concentrations. No confirmatory tests were performed.
14. At the hearing before the deputy commissioner, the Plaintiff testified that he last used marijuana in the evening a night or two prior to the day of his work injury. Plaintiff's testimony about when he last used marijuana is credible and consistent with other testimony presented in this matter. *Page 7 
15. The undersigned have relied upon expert testimony, the medical records, and other evidence of record to assess whether Plaintiff was impaired by marijuana or any other substance at the time of the accident. Two experts in the field of toxicology testified in this case. Dr. Shayne C. Gad was retained by the Defendants and Dr. Andrew P. Mason was retained by the Plaintiff.
16. Dr. Gad earned his Ph.D. in pharmacology toxicology from the University of Texas at Austin. His primary work experience has been in testing and studying potential new drugs for pharmaceutical companies. Dr. Mason has a Ph.D. in medicinal chemistry from the University of North Carolina at Chapel Hill. He is board certified in forensic toxicology and toxicological chemistry. He is the former Chief Toxicologist in the Office of the N.C. Chief Medical Examiner. He worked for the National Medical Services as director of forensic toxicology which included responsibility for clinical, occupational and environmental forensic testing. He now has his own consulting company and is an adjunct professor in the Chemistry Department at Appalachian State University.
17. Dr. Mason testified, "it's well recognized in the scientific community, urine tests cannot be used to establish impairment." Dr. Mason provided a list of ten quotes taken from scientific articles of forensic toxicology that support his statement that "even competently performed forensic urine tests, by themselves, do not establish impairment."
18. Dr. Gad testified that to determine impairment, the drug test had to provide the levels of concentrations in order to be able to give an opinion about impairment. Dr. Gad stated: "If the substance is metabolite for cocaine or marijuana, if you — those metabolites have minimal or very limited activity. And if you just know that you have some of it in the urine, you can't — you can't speak to impairment." Dr. Gad's testimony shows that the test results in this case, *Page 8 
because it only reported a positive result for marijuana, merely showed that "at some point, he used marijuana."
19. Following the urine toxicology results, the medical record in question states "positive results have not been verified by a second confirmatory procedure. Unconfirmed results should not be used for nonmedical purposes." Both toxicologists agree that the urine toxicology test in question was a test completed for medical purposes only, not valid for forensic purposes. Both toxicologists agree that a urine toxicology test that does not provide an actual level for cannabinoid concentration does not address impairment and therefore cannot be used to show impairment.
20. Both Dr. Mason and Dr. Gad testified that the psychoactive effects of marijuana remain active for a limited period of time. Dr. Mason testified that it was usually up to four hours, while Dr. Gad testified that it was between four and six hours, depending on the dose. Even if the Plaintiff had smoked marijuana just before going to work, any psychoactive effects would have faded before the work accident.
21. Dr. Mason testified that marijuana metabolites are "detectable in urine for days or weeks depending on dose, use history, etc." Dr. Mason testified that a positive result on a urine test would show that the marijuana exposure "certainly could have happened at any time within the prior week." To support this position, Dr. Mason cited a 1995 article in The Journal of Analytical Toxicology.
22. When the Plaintiff arrived at the emergency room at Highlands-Cashiers Hospital, he was given two doses of morphine for the pain. Per Dr. Gad's testimony, the positive result for opiates on the drug screen could be explained by the administration of morphine at Highlands-Cashiers *Page 9 
Hospital. Likewise Per Dr. Mason, it is found that the prescribed morphine injections would cause a positive result for opiates on the drug screen.
23. The testimony of those who were with the Plaintiff on the day of the accident confirm that he did not consume marijuana at any time during the work period on the day he was injured. There is no credible evidence that on the day of plaintiff's work injury, Plaintiff was under the influence of marijuana or other controlled substances. This conclusion is consistent with the medical records. The greater weight of the evidence shows no indication that Plaintiff was impaired or intoxicated at the time of his work related accident.
24. Plaintiff's fall at work was caused by an accidental misstep of the Plaintiff and the circumstances of the work environment, where the railing he attempted to use to steady himself gave way. The greater weight of the credible and competent evidence fails to establish that the accident which caused Plaintiff's injuries was proximately caused by Plaintiff being under the influence of any controlled substance.
25. Following his accident and surgery, Plaintiff received follow-up treatment from Dr. Richard Lytle at Mountain Neurological Center in Asheville. At his visit on February 15, 2006, Dr. Lytle stated in his office notes that he would see Plaintiff in one month, and at that time, he hoped to be able to release Plaintiff back to work at least on a limited basis. Dr. Lytle's notes of March 17, 2006 state that Plaintiff was written out of work until his next appointment scheduled for May 16, 2006.
26. At his visit on May 22, 2006, Plaintiff asked Dr. Lytle to allow him to try to return to limited work on a part-time basis. In response, Dr. Lytle stated in his notes that Plaintiff could resume work up to four hours per day with no lifting greater than forty pounds and no repetitive bending. *Page 10 
27. On July 18, 2006, Dr. Lytle stated that the Plaintiff had been unable to return to his work, as his employer does not have anything for him to do on a short-term basis and that his employer felt that Plaintiff was too high risk to continue to work. Dr. Lytle further noted that depending on how Plaintiff improves, he can easily write him a work release to state that he can return to work. Dr. Lytle noted however, at that time, P was not working, but that he would provide as work release note as needed.
28. Based on Plaintiff's work experience and vocational and educational limitations, it would have been futile for Plaintiff to seek to obtain physically suitable employment during the time that he was under restrictions of part-time work with no lifting over twenty-five pounds.
29. Defendant did not terminate the Plaintiff as an employee. In May 2006, the owners of Defendant discussed with the Plaintiff the possibility of his returning to limited part-time work activities with Defendant. Defendant could not make accommodations for the Plaintiff to return to work with them once the Plaintiff was released to limited part-time work. Plaintiff has not performed any work for Defendant since the date of his injury, December 7, 2005.
30. There is no evidence as to when Plaintiff may have reached maximum medical improvement or whether he has sustained any permanent impairment. There is no evidence regarding his current physical limitations or capacity to return to work.
31. Defendants denied the claim by a Form 61 dated December 14, 2005. Defendants have not paid for any medical treatment or medical expenses, including travel and prescription medications. Defendants have not paid any disability payments to the Plaintiff. *Page 11 
32. Plaintiff worked for Defendant a period of 58 days prior to his work injury. According to the Plaintiff's W-2 Form from Defendant, Plaintiff earned $4,449.06 in 2005 while working for Defendant. This yields an average weekly wage of $536.95.
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 CONCLUSIONS OF LAW
1. The employer bears the burden of proof for the affirmative defense of intoxication or impairment. Wiley v. Williamson Produce, 357 N.C. 41577 S.E. 2d 622 (2003), adopting the dissenting opinion in Wiley v.Williamson Produce 149 N.C. App. 74, 562 S.E.2d 1 (2002). When asserting this affirmative defense under N.C. Gen. Stat. § 97-12(2), the employer must show that (1) the Plaintiff was under the influence of a controlled substance at the time of the injury by accident, and if so, (2) that the impairment was a proximate cause of the accident. Id.
2. The positive toxicology result from Mission Hospitals is not a result that would establish intoxication or being under the influence, such as to create a presumption of impairment. However, even if such a presumption of impairment were created, Plaintiff has presented sufficient competent testimony through toxicologist, Dr. Andrew P. Mason, which rebuts any such presumption. Defendants' assertion of such defenses are therefore rejected. N.C. Gen. Stat. § 97-12.
3. Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with the Defendant on December 7, 2005. N.C. Gen. Stat. § 97-2(6).
4. Plaintiff is entitled to have Defendants pay for all health care services and supplies that Plaintiff has heretofore received for his compensable back and neck injury *Page 12 
sustained on December 7, 2005, including all emergency and follow-up services. Plaintiff is entitled to have Defendants provide further health care services and medications and supplies for said injury that will effect a cure, provide relief or lessen the period of disability, and for mileage expenses incurred for medical treatment. N.C. Gen. Stat. §§ 97-2(19), 97-25.
5. As Plaintiff's period of employment prior to his work injury was less than 52 weeks, Plaintiff's average weekly wage is based upon the method of dividing his earnings during his period of employment by the number of weeks and parts thereof. Based upon the evidence that Plaintiff worked for the Employer-Defendant a period of 58 days prior to his work injury, earning $4,449.06 in 2005, his average weekly wage of $536.95, yields a compensation rate of $357.98. N.C. Gen. Stat. § 97-2(5).
6. As a consequence of his injuries sustained in the accident of December 7, 2005, Plaintiff was unable to earn wages in the same or any other employment and was totally disabled beginning December 7, 2005 and continuing at least through the hearing date of October 9, 2006. Plaintiff is entitled to have Defendants pay him temporary total disability compensation at the rate of $357.98 per week during this period. N.C. Gen. Stat. § 97-29.
7. Plaintiff is entitled to have Defendants pay him temporary total disability compensation or temporary partial disability compensation until such time as Plaintiff is able to return to work at the same or greater wages than his weekly compensation rate. Therefore, unless the parties reach a private resolution of this matter, and until further agreement of the parties or order of the Commission, Defendants shall continue to pay Plaintiff total disability compensation. N.C. Gen. Stat. § 97-29.
8. At such time as it may be determined that Plaintiff has reached maximum medical improvement (MMI) and he is provided with any permanent impairment rating(s) for any body *Page 13 
part, Plaintiff may be entitled to compensation for such permanent impairment pursuant to N.C. Gen. Stat. § 97-31. This issue is left open for further resolution at the appropriate time.
9. Defendants have not shown that, following his work injury, Plaintiff was terminated by Defendant-Employer for the positive drug test result. Defendants have not shown that at any time Defendants offered Plaintiff suitable employment consistent with his restrictions. Therefore, Plaintiff has not constructively refused suitable employment.Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228 (1996).
10. Plaintiffs counsel has rendered valuable services and is entitled to a reasonable attorney's fee, in the amount of twenty-five percent (25%) of the entirety of Plaintiff's past due and future compensation benefits for total (or partial) disability, which is hereby awarded to Plaintiff's counsel. N.C. Gen. Stat. § 97-90.
11. Although the Full Commission does not find the Defendants' defenses of intoxication or impairment persuasive, the Full Commission does not find that this matter was defended without reasonable grounds so as to impose attorneys fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay all medical and related expenses incurred by Plaintiff as a result of the compensable injury of December 7, 2005. If Plaintiff or any third party has made payments on any such bills, Defendants shall reimburse such party for such payments in full. *Page 14 
2. Defendants shall authorize and pay for all continuing medical treatment and expenses, including but not limited to diagnostic testing and referrals, related to the compensable injury, as incurred, subject to the limitations period set out in N.C. Gen. Stat. § 97-25.1.
3. Defendants shall pay to Plaintiff temporary total disability benefits at the rate of $357.98 per week beginning December 7, 2005 and continuing until further agreement of the parties and subsequent order of the Commission. Such benefits have accrued and shall be paid in a lump sum, subject to the attorney's fee.
4. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation payable to Plaintiff for his wage loss is hereby approved for Plaintiff's counsel. The attorney's fee approved shall be paid as follows: twenty-five percent (25%) of the lump sum compensation Plaintiff is to receive shall be deducted from that sum and paid directly to Plaintiff's counsel. Defendants shall thereafter pay and deliver every fourth check for Plaintiff's temporary total or temporary partial disability benefits directly to Plaintiff's counsel.
5. Defendants shall pay the costs and shall be responsible for reimbursement to Plaintiff for the cost incurred in securing the testimony of Dr. Mason.
This the 3rd day of July 2008.
S/_________________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/_________________________ BERNADINE S. BALLANCE *Page 15 
COMMISSIONER
 S/_________________________ BUCK LATTIMORE COMMISSIONER *Page 1